March 4, 2019

Honorable William C. Griesbach
125 South Jefferson Street
Room 203
Green Bay, WI 54301-4541

      **Re:** ***United States v. Seth Rector***
            **EDWI Case No. 18CR00103**

Dear Judge Griesbach:

## INTRODUCTION

    This is a brief outline regarding Seth Rector's character for your consideration at his sentencing hearing on Friday, March 8, 2019. Attached are several letters regarding Seth's good character from family members, friends, and employers. The government will be recommending 48 months imprisonment. We are recommending that Seth receive a sentence of a six (6) to twelve (12) months of home confinement and a six (6) to eight (8) years of supervised release for the reasons set forth below.

    On December 14, 2018, he entered a guilty plea to Count 1 of the Indictment under 18 U.S.C. § 2252A(a)(5)(B) – Possession of Child Pornography. Under the facts and legal argument detailed below, we believe that a sentence of home confinement followed by supervised release is a legally sufficient and appropriate punishment for this offense.

    What follows is a brief explanation of Seth's background and character, as well as a legal discussion of the impropriety of the sentencing guidelines for child pornography cases and as examination of similarly situated defendants who received sentences of probation and/or home confinement. I hope that these materials are helpful to you in determining the ultimate resolution of this matter for Seth.

## BACKGROUND

    Seth Matthew Rector was born to Loretta King and Mark Rector on July 5, 1981. Growing up, Seth's father remembers Seth as a kind, caring, and selfless individuals who had a close

1110 N Old World 3rd St., Suite 218 • Milwaukee, WI 53203
www.birdsall-law.com • Phone: (414) 831 5465 • Facsimile: (414) 831 5468 •
Email: jbirdsall@birdsall-law.com

relationship with everyone in his family.[1] Seth's sister, Ali Hendries, also remembers Seth as a child being "kind, smart, and energetic." Seth excelled at sports from a young age. Seth's mother wrote of Seth's engagement in multiple sports and Seth's father noted that Seth became a national gymnast when he was only 11 years old.

Seth was an excellent student in school up until his sophomore year of high school when he fell into the wrong crowd. Seth's mother noted that Seth "began hanging out with friends who were experimenting with marijuana and alcohol. Shortly after graduating from high school Seth had multiple DUI convictions and other charges." But since that time Seth has worked hard to become a better person. Seth's mother wrote that "[f]or over a decade Seth has made changes in his life to improve his behavior. He [consciously] chooses to not drink and drive. He is an avid reader and particularly enjoys self-improvement books."

Seth's family means everything to him. According to Michelle Lehman, a former girlfriend, Seth spoke often of his parents and helped them whenever they needed anything. He frequently spends time with his parents and Sister, Ali who noted her "boys love having Nerf gun wars with Uncle Seth."

## CHARACTER OF THE DEFENDANT

Seth Rector is a devoted, caring, family orientated individual—an individual who, although has been faced with hardship, continues to care about the people in his life and in his community.

Seth is known to go above and beyond in his commitment to his family and friends. Without hesitation, Seth has come to family's aid looking only to help those he cares for. Seth's sister, Ali Hendries, stated:

"When I was 8 months pregnant with my first son, my husband and I found out we needed to have our roof replaced. That same week, Seth and his friend Tom spent the entire weekend replacing our roof. They worked hard from morning until night to get the job done. In addition, when I discovered my gutters were clogged, Seth came over right away to clean them out and install gutter guards."

A close friend of Seth, Justin Rehm, writes:

"Two and a half years ago I bought a cabin up north and until about the last year…Seth has been by my side helping me transform it into the cabin of my dreams without asking for a single thing in return, knowing that he [i]s helping a friend is enough payment for him."

Not only has Seth helped his family and friends as a handyman, he has also opened his home to friends when they are in need. Benjamin Gehrt, a friend to Seth for over 30 years, and

---

[1] All factual references are from the attached family letters.

Michelle Lehman, a former girlfriend both wrote of times when Seth let them stay with him when they were at low points in their lives. Michelle Lehman, stated:

> "I had a major brain injury this past summer and needed a place to stay because I couldn't work for at least 6 months after it happened on doctor['] orders. Seth volunteered for me to stay with him. I was very depressed at this time in my life. Seth was always there and was always caring towards me during this difficult time."

It is one thing to lend a helping hand to friends and family when they are in need but on multiple occasions Seth has risked his life saving others from grave harm. Seth's father, Mark Rector wrote of two separate occasions where Seth put his life on the line to save another person's life:

> "The first instance happened when Seth pulled four of his friends from a burning car in Waupaca. The car ran off of the road into a raven, rolled several times, then started on fire. Everyone inside the car was knocked unconscious, except for my son. Seth risked his life by pulling the other four passengers to safely before the car exploded. The fifth life he saved was his friend Jason Mattson. Jason was washed out to sea by an undertow in the Atlantic Ocean in Florida. Seth saw him struggling to stay above water, so Seth went out the length of the football field, got to Jason, put him on his back and swam back to shore."

This experience has been devastating for both Seth and his family. Seth is ashamed of being involved in this case and has become deeply depressed because of the turmoil he knows it has caused his family. According to Seth's sister, Ali, Seth is "extremely remorseful" and "worries about the pain he is causing [their] parents." Seth is deeply worried about the impact incarceration will have on his parents who have had their own fair share of traumatic experiences over the last year. Roughly 6 months ago Seth's father was held at gunpoint during a burglary in his home and around the same time Seth's mother came down with an extended illness. These incidents have left Seth scared of what may happen to his parents while incarcerated and he cherishes what time he has left with them.

## MITIGATING FACTORS

### FBI misrepresentation

On October 26, 2017 FBI Agent Brett Banner conducted an interview with Seth. In his summary of the interview Agent Banner states that Seth answered affirmatively when asked if he masturbated to the child pornography found on his computer. See, Presentence Investigation Report (PSR), ¶15. This was a misrepresentation of Seth's reply. This interview was videotaped at the Appleton Police Department and Seth indicated that while masturbating to *legal* pornography, he would scroll through files he downloaded the night previous; only then would he discover the child pornography within those files and promptly delete the files containing child pornography. The government's characterization is deeply misleading and suggests that, despite evidence to the contrary, Seth was seeking out these files. As he has made plain then and now, this is not the case.

<u>Lie Detector Test</u>

Following Seth's interrogation, he volunteered for a lie detector test. He was asked the following questions reproduced from the report:

**SERIES I**
A. As an adult have you had any sexual contact with a child? (No)
B. Since the age of 18, have you ever participated in any sexual activity with a child? (No)

**SERIES II**
A. As an adult, have you ever touched a child in a sexual way? (No)
B. Since the age of 18, have you had any inappropriate sexual contact with a child? (No)

The examiner and the agent reviewing the results indicated two exculpatory results: Inconclusive (INC) and No Deception Indicated (NDI). They also indicated there were no "countermeasures" suspected such are controlling heart rate or breathing in an attempt to evade detection of a lie.

<u>Dr. Thompson's Report</u>

Dr. David W. Thompson, a forensic psychologist, evaluated Seth to determine his risk of recidivism for the current offense or in contact offenses with children and recommended outpatient management for Seth as the appropriate level of care. See, *Forensic Evaluation*, Dr. David W. Thompson, dated January 22, 2019, attached at Appendix, pp. 8 - 15. The results of Dr. Thompson's extensive risk evaluation indicate that Seth presents a low to low-moderate risk for future sexual reoffending. *Id*. After reviewing Seth's background and current clinical condition, Dr. Thompson administered several widely used standardized test to determine Seth's level of pyschological functioning as well as his risk to reoffend or to remain in the community. *Id*.

*Psychological Testing*

The Shiley-2 assesses "crystallized ability," "fluid cognitive ability," and "provides estimates of overall cognitive ability." *Id*. Seth's performance placed him "solidly within the average range." The Minnesota Multiphasic Personality Inventory (MMPI) assess personality traits and psychopathology. *Id*. Dr. Thompson used the updated MMPI-2-RF. *Id*. All portions of the test were within normal range. *Id*. Dr. Thompson could not use the Static-99 – a traditional risk assessment tool for sex offenders – because the tool specifically excludes individuals whose offense have been limited to downloading child pornography. *Id*. Instead he used the Sexual Violence Risk – 20 (SVR-20) to assess future risk of sexual violence and concluded that he was a low to low-moderate risk for future sexual offending. *Id*.

*Testing Results and Conclusions*

Applying those test results, Dr. Thompson stated that: 1) Seth shows "no indications of a broadly antisocial lifestyle or of a callous, exploitive personality," 2) no "evidence that [that Seth's internet activity was] preferential [for child pornography]," and; 3) Seth's brief and unexpected viewing was the result of "experimentation and exploration" rather than actual interest. *Id*. He further concluded that since the most recent data shows a recidivism rate of a mere 7.4% for non-

contact offenders his likelihood of reoffending is extremely low and, thus, he "presents as well within the limits of risk appropriate outpatient management." *Id.*

SIFT Report

The defense retained computer forensic experts at the firm of Special Investigations & Forensic Technologies (SIFT) in Madison, Wisconsin. Analysts Nicholas Schiavo and Daniel G. Guerra, Jr. examined the two hard drives that were seized from Seth's home. They made exact forensic copies of the drives (sans images or media) and analyzed the evidence regarding the charged images from this case as well as the uncharged images. See, Forensic Case Report, Appendix pp. 16 - 22.

- *Charged Images*

The report first notes that the charged images were quite small, and they provide a visual representation of the actual sizes. *Id.* The "File Created" and "Last Accessed" dates and times are identical, suggesting either that they were not viewed or were immediately deleted. Buttressing this suggestion is the indisputable finding that the files were "all web cached entries, not saved by the user or accessible to the user" and were "located within a subfolder called "AppData" which, by default, is a hidden folder within Windows." *Id.* The files were nowhere else on the computer and, critically, "[t]here is no indication that the charged files were ever downloaded to the computer." *Id*.

- *Other Images*

Within the "Downloads" folder (which is created by Windows), there was a subfolder called "lucid." The remainder of the child pornography (except for 3 images in unallocated and 1 in a lone folder[2]) were located here. The analysts explain that the name of the folder was likely system created and that the entirety of the folder, and its subfolders, were the result of a *single* download. The basis of this conclusion is because the file creation times were nearly identical with the entirety arriving on 9/4/2017 between 5:43:43 pm to 6:05:47 pm. *Id.*

- *Internet Searches*

The analysts found that, incredibly, there were only two (2) Google searches in the life of the machines. None of those searches showed any terminology that would suggest a search for child pornography. They also looked at "Parsed Search Queries" which is all non-Google searches and often include "redirects" from prior searches. There were twenty-three (23) Parsed Search Queries and, as with the Google searches, none of those searches showed any terminology that would suggest a search for child pornography.

- *Search Warrant Affidavit*

The government alleges in its application for a search warrant that 1) they did not observe or download any images in its investigation[3] and 2) that they observed two (2) titles of videos they claim resembled child pornography. *Id.* The SIFT analyst searched both computers and "[n]either file … or any remnants, were located…" on them.

---

[2] PSR ¶14.
[3] PSR ¶12-13

- *Conclusion – SIFT Report*

Following this analysis, Seth's oft stated claim that he downloaded TV shows, movies and adult pornography and that the child pornography that appeared in these downloads was deleted is true. It also supports, as reasonable, the defense recommendation for a sentence of probation.

## Sentencing Guidelines for Child Pornography – an Analysis

The guidelines in use currently for child pornography offenses, including the suggested guideline calculation for Seth in this case, are not connected to empirical evidence that support the harsh sentences they purport to impose. For the Court's benefit, I have included below an in-depth analysis of how the guidelines for child pornography cases have dramatically increased over the years. The conclusion the Court can draw is that this lack of evidence makes reliance on the present guideline calculation for Seth inapposite to a just result.

## The Sentencing Commission's Report to Congress

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["Child Porn Report"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguish among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging

in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers,"
*id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Lime Wire, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P filesharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; see also *id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii,

322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

The Guideline Rests on Commission and Congressional
Assumptions That Are Contrary to Empirical

In the time since the guideline for possession of child pornography was first promulgated, the offense level applicable to Seth's offense before acceptance of responsibility has risen by 21 levels, from 12 to 33, and the applicable range has risen from 6-12 months to 97-121 months, an increase of more than 1,600%.

**Effect on Seth's Guideline Range Over Time**

| Past Practice | Not a crime |
|---|---|
| 1991 – Original Guideline | 10  Base Offense Level |
| § 2G2.4 | 2  Prepubescent minor |
| | <u>-2</u>  Acceptance of responsibility |
| | **10  6-12 months** |
| | |
| 1991 Amendments | 13  Base Offense Level |
| § 2G2.4 | 2  Prepubescent minor |
| | 2  10 or more items |
| | <u>-2</u>  Acceptance of responsibility |
| | **15  18-24 months** |
| | |
| 1996 Amendments | 15  Base Offense Level |
| § 2G2.4 | 2  Prepubescent minor |
| | 2  10 or more items |
| | 2  Possession as a result of computer use |
| | <u>-3</u>  Acceptance of responsibility |
| | **18  27-33 months** |
| | |
| 2003 Amendments | 15  Base Offense Level |
| § 2G2.4 | 2  Prepubescent minor |
| | 2  10 or more items |
| | 4  Sadistic or masochistic conduct |

|  |  |
|---|---|
| 2 | Possession as a result of computer use |
| 5 | More than 600 images |
| -3 | Acceptance of responsibility |
| **27** | **70-87 months** |

| 2004 Amendments | 18 | Base Offense Level |
|---|---|---|
| § 2G2.2 | 18 | Base Offense Level |
|  | 2 | Prepubescent minor |
|  | 2 | Distribution |
|  | 4 | Sadistic or masochistic conduct |
|  | 2 | Use of computer for the possession of the material |
|  | 5 | More than 600 images |
|  | -3 | Acceptance of responsibility |
|  | **30** | **97-121 months** |

Most of this massive increase was mandated by Congress. Under the Sixth Circuit's decision in *U.S. v. Bistline*, with respect to enhancements mandated by Congress, this Court must refute Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d 758, 763-764 (2006). With respect to enhancements adopted by the Commission without a congressional mandate and without empirical grounds, the guideline is vulnerable precisely on that ground. *Id.* at 764.

In *Kimbrough v. U.S.*, the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. 85, 94-99 (2007). Likewise, Congress, in dictating much of the content of § 2G2.2, relied on "assumptions . . . that more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has now released a report that recommends ameliorating changes to the child pornography guideline. *See Child Porn Report* at 320-24.

Meanwhile, the Sixth Circuit's account of Congress's reasons in *Bistline* is incomplete and in part inapposite. It cited two sources for the "grounds" of congressional action in raising offense levels under § 2G2.2: (1) a directive to the Commission set forth in Pub. L. No. 108-21, § 513(c) (2003), and (2) an observation by the Commission that "Congress has demonstrated its continued interest in deterring and punishing child pornography offenses." 665 F.3d at 764.

The directive cited by the court in *Bistline* is not relevant to the guideline range in this case. It stated that the "Commission shall review and, as appropriate, amend the Federal Sentencing Guidelines and policy statements to ensure that the guidelines are adequate to deter and punish conduct that involves a violation of" 18 U.S.C. § 2252A(a)(3)(B), which criminalized pandering, "or" 18 U.S.C. § 2252A(a)(6), which criminalized distribution of child pornography to

a minor for purposes of inducing the minor to participate in illegal activity. Pub. L. No. 108-21, § 513(c) (2003). Seth was not convicted of either offense, and the directive had no effect on his guideline range. The Commission's general observation that Congress was interested in deterring and punishing child pornography offenses will be addressed below in connection with its reasons for directives that affected the guideline range in this case.

<u>Current Evidence Refutes Congress's Reasons for Increasing Penalties.</u>

As set forth in Appendix 3, Congress directed the Commission to take four actions relevant to Seth's guideline calculation: (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; (3) expand the definition of "distribution" to include "non-pecuniary interest"; and (4) add the 2-level enhancement for use of a computer. Congress itself added the 4-level enhancement for materials depicting sadistic or masochistic conduct and the number-of-images table, which included the 5-level enhancement for 600 or more images.

Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes.

1. *The belief that child pornography possessors are pedophiles who use pornography to molest children*

When it directed the Commission in 1991 to increase the base offense level from 10 to 13, Congress acted on the belief that those who possess child pornography are actually predatory child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on "predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley). When it directed the Commission to define "distribution" to include distribution for "a nonpecuniary interest," Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch). And while there

was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements. *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.

However, as explained above, this belief is not supported by current research. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012). Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." *Id.* at 1723. Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id.* at 1715. The "Butner study," cited by Senator Hatch in support of the Feeney Amendment, has since been thoroughly discredited and rejected as a basis for punishment. *See* note 3, *supra*. The Commission confirms that "not all child pornography offenders are pedophiles or engage in other sex offending." *Child Porn Report* at 104.

Seth has not been convicted of sexually abusing a child, has not in fact sexually abused a child and is at no risk of harming a child. This distinguishes Seth from the offenders Congress had in mind.

Nor is there any evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. When Congress added the enhancement for sadistic or masochistic materials to § 2G2.4 for possession offenses, it simply mirrored the same enhancement the Commission had added to § 2G2.2 for trafficking offenses in 1990, which in turn mirrored the same enhancement under § 2G3.1, the adult obscenity guideline. *See* U.S. Sent'g Comm'n, *History* at 15 n.68. The § 2G3.1 enhancement, in turn, was not based on empirical evidence; indeed, the Commission had proposed eliminating it but retained it for the sole reason that the Department of Justice objected to its removal. U.S. Sent'g Comm'n, *Working Group on Child Pornography and Obscenity Offenses and Hate Crime* 42, 45 (1990).

The Commission confirms that technological advances have made large numbers of graphic images readily available so that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct," and over two thirds of possession-only offenders receive the enhancement for images depicting sadistic or masochistic conduct. *Child Porn Report* at 84, 209. At the same time, the enhancement for possession of sado-masochistic images are "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. This comports with other available evidence, which shows that the level of severity of the images possessed does not correlate to an increased risk of committing another child pornography offense or a contact offense. *See* Jody Osborn et al., *The Use of Actuarial Risk Assessment Measures with UK Internet Child Pornography Offenders*, 2 J. Aggression, Conflict & Peace Res. 16, 19 (2010).

The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *U.S. v. Kelly*, 868 F. Supp. 2d 1202, 1209. With the Internet and programs like Lime Wire, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124. The Sentencing Commission has now acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," *Child Porn Report* at 6, and that as the result, the current enhancement for number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id.* at 323. It also recommends that the enhancement be updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." *Id.* And, as with the enhancement for the nature of the images, the Commission confirms that the enhancement for number of images possessed is not "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Sixth Circuit, too, has recognized that the enhancement may overstate the seriousness of the offense, and more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time" and who "paid money" for images. *See U.S. v. Robinson*, 669 F.3d 767, 778 & n.3. Thus, not only is the number-of-images enhancement "not linked to any empirical data pertaining to sentencing and the purposes of punishment," *see United States v. Schinbeckler*, 2011 WL 4537907, at *6 (N.D. Ind. Sept. 29, 2011), but according to the views of both the Sentencing Commission and the Sixth Circuit, it is particularly unsuited for those who, like Seth, acquired during a relatively short period of time more than the defined number of images, many of them duplicates, never paid for or traded images, and did not knowingly save or share images.

> 2. *The belief that severe punishment for possession will dry up the market and prevent the abuse of children*

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[4] And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in

---

[4] The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. See *Bistline*, 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); *see also id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Seth is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010) ["UNDOC, Globalization of Crime"], and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet. The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs. *Child Porn Report* at 98.

Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. *See* U.S. Sent'g Comm'n, 1996 Report, at 28-30 & n.23; *see also U.S. v. Dorvee*, 616 F.3d 174, 185-86 (2d Cir. 2010) (recognizing the Commission's criticism); *U.S. v. Phinney*, 599 F. Supp. 2d 1037, 1042 (E.D. Wis. 2009) ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction."). Here, Seth did not use his computer to trade or knowingly disseminate images, or to make images accessible to children. He is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, *Globalization of Crime* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even 592 additional images is miniscule.").

### 3. The belief that punishing possessors of child pornography will deter the commission of child pornography offenses

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). The Sixth Circuit, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *Bistline*, 665 F.3d at 764. But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken. As shown in Part I.B, *supra*, empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all the empirical research is in agreement that imprisonment does not reduce recidivism. *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree et al., *Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime –

the overwhelming consensus of the literature is that treatment works, incarceration does not.").[5] As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries 11 (2007).[6] Instead, "[i]ncarceration actually results in slightly increased rates of offender recidivism." *Id.*[7] In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions."). As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[8]

Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *Child Porn Report* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id*. at 282.

In sum, each of Congress's actions rested on unfounded assumptions. As the Commission

---

[5] Available at http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_ January302012.pdf.

[6] Available at http://nicic.gov/library/files/023358.pdf.

[7] See also Mark W. Lipsey and Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007) ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism. The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence."). A recent Missouri study shows "that recidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations." Missouri Sentencing Advisory Commission, Probation Works for Nonviolent Offenders, 1 Smart Sentencing 1 (June 2009), http://www.courts.mo.gov/file.jsp?id=45429. On a three-year follow up from the start of probation or release from prison, first or second-time offenders on probation were incarcerated at a significantly lower rate (36%) than those who had been sent to prison (55%). Id.

[8] See generally Martin H. Pritikin, Is Prison Increasing Crime, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); see also U.S. Sent'g Comm'n, Staff Discussion Paper, Sentencing Options under the Guidelines 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties).

has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy, and revising that policy considering actual court sentencing experience over time." U.S. Sent'g Comm'n, Mandatory Minimum Penalties in the Federal Criminal Justice System 122-23 (1991). Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

**The Commission's Choices Were Not Based on Empirical
Evidence or National Experience.**

Congress directed the Commission to define "distribution" to include distribution for a "nonpecuniary interest," Congress did not direct the Commission to add the 2-level enhancement for distribution that could have been applied in Seth's case. Nor did Congress direct the Commission to consolidate § 2G2.4 with § 2G2.2 in 2004, which resulted in the application of the distribution enhancement in simple possession cases regardless of *mens rea* and regardless of the purpose of the distribution. The Commission also chose to increase the base offense level from 15 to 18, and to count each video as 75 images. Each action was done without empirical support.

*Distribution not for pecuniary gain, thing of value, or to a minor, and without mens rea.*

The Commission provided no empirical basis for adding the 2-level enhancement for distribution that is not for pecuniary gain or "thing of value," or to a minor. USSG App. C, amend. 592 (Nov. 1, 2000); USSG § 2G2.2(b)(3)(F). Instead, it referred to "congressional concerns" that "pedophiles" distribute pornography over the Internet "to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity." It did not give any reason for increasing sentences for those sentenced under § 2G2.2 who did not engage in that conduct, and thus were not the object of Congress's concern.

Moreover, when the Commission consolidated § 2G2.4 with § 2G2.2, the result was that the enhancement now applies in simple possession cases whenever there was any distribution of any kind, and regardless of *mens rea,* a result the Commission did not explain or even acknowledge. The extremely wide net thus cast by the Commission ensnares those, like Mr. Rector, whose distribution was neither knowing nor to any children, but only as a by-product of the operation of the bit torrent program. The Commission now acknowledges that offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders, like Seth, using peer-to-peer networks like bit torrent that usually unknowing to them distribute material "in an indiscriminate manner," while others, more culpable than Seth, "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Child Porn Report* at viii, 61-62. Because it "fail[s] to differentiate among offenders in terms of their culpability," the enhancement results in overly severe sentences for offenders like Seth. *Id.* at iii, xi, 209, 323.

In short, the enhancement goes far beyond congressional concerns, is not based on empirical data does not further any sentencing purpose, and is unsound.

*Increase to base offense level from 15 to 18.*

In 2004, the Commission increased the base offense level in possession cases from 15 to 18 "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, *History* at 44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground").

The Commission has since acknowledged that the mandatory minimums in this area "may be excessively severe." U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 365 (2011). It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.,* and that prosecutorial charging practices suggest that prosecutors also believe that the mandatory minimum penalty is too high. *Id.* Thus, the current base offense level is not only devoid of empirical basis, but contrary to national experience.

*Counting each video as 75 images.*

In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction [as] one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)). It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.* As a result, possessing just 10 digital videos would increase the number of "images" from by 750, subject to a 5-level enhancement.

The Commission did not provide any reason for this change. It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table. *See* U.S. Sent'g Comm'n, *History* at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range"). In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, but was based on the Department of Justice's request and Congress's number of images table, which itself was adopted without explanation or justification. The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm. Moreover, as the Sixth Circuit

suggested in *Robinson*, this enhancement is particularly unsound as applied to a defendant who, acquired freely available videos over a relatively short period of time and did not knowingly save or distribute them. *See* 669 F.3d at 778.

<u>Enhancements That Apply in Nearly Every Case Do Not Serve Their Purpose.</u>

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011).

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09. As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an "anomaly." *Id.*

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. Because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Child Porn Report* at ii, xi, 209, 323.

<u>The Original Guideline Is a More Appropriate Starting Point.</u>

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2 "in terms that are persuasive on policy grounds." *Bistline*, 665 F.3d at 763, 764. The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; *see also Phinney*, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of § 2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months").

The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991. That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991).

The Commission expressed concern that raising penalties even higher "may aggravate this below guideline rate and heighten sentencing disparity." *Id.*

Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28. While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

Under the original guideline, Seth's offense level would have been 12. With two levels off for acceptance of responsibility, *see* USSG § 3E1.1 (1991), his total offense level would have been 10. In Criminal History Category I, his guideline range would have been 6 to 12 months in Zone B. See USSG, App. C, amend. 372 (Nov. 1, 1991). And the guidelines would permit a sentence of five years' probation with six months of home confinement. USSG § 5C1.1(c)(3). Here, in order to take account of the extensive and compelling evidence that any term of imprisonment would be harsher than necessary in light of Seth's age, health, family circumstances, low risk of recidivism, Seth asks this Court to impose a sentence of one day in custody, a significant period of home confinement, and ten years' supervised release with conditions—a greater loss of liberty than even the original guideline would require.

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3). In declining to follow § 2G2.2 on policy grounds, this Court will be in good company. Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe. *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, tbl.8 (2010).[9] And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%). *Id.* tbl.11. As more fully set forth in Part II, *supra*, judges sentence below the guideline range recommended by § 2G2.2, sometimes far below, in the large majority of cases. Congress directed the Commission to take this data into account in reviewing and revising the guidelines, see 28 U.S.C. § 994(o), and it is in the process of attempting to do so. *See* U.S. Sent'g Comm'n, *History* at 1 nn.4, 8; *Child Porn Report* at ii, 322-23.

The sentence requested in this case is not anomalous. Attached in the Appendix at pp. - is a list of cases where the defendant received a sentence of either probation or only days in custody for possession of child pornography offenses.

Congress has provided for a range of sentences, from a term of probation of one to five years to 20 years' imprisonment, and if a term of imprisonment is imposed, has authorized a term of supervised release of at least five years and at most life. *See* 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k). "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all." *United States v.*

---

[9] Available at http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

*Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

The Sixth Circuit has indicated that a sentence of one day in custody, a significant period of home confinement, and ten years of supervised release with conditions would be a sufficient sentence. In *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012), the defendant possessed 7,100 images, including images of torture and bondage, and the guideline range was 78-97 months. The judge varied downward based on Robinson's individualized circumstances, which included his older age (43) and a "debilitating back condition," and imposed a sentence of one day in prison and five years' supervised release, without any period of home confinement. *Id.* at 772, 775. Although the Sixth Circuit reversed the sentence as substantively unreasonable, its analysis indicates that if the court had imposed a period of home confinement of 12 or 18 months, the sentence would have been sufficient. First, it said that the sentence would not deter others because it was "devoid of any significant period of incarceration, home confinement, or substantial fine." Second, in discussing the need to avoid unwarranted disparities, it distinguished the sentence imposed in Robinson's case from two other one-day sentences it had previously affirmed, *see United States v. Stall*, 581 F.3d 276 (6th Cir. 2009), and *United States v. Prisel*, 316 F. App'x 377 (6th Cir. 2008), on the ground that those sentences included a significant fine or period of home detention. *Id.* at 779.

In *Stall*, the defendant had only 18 images at the time of his arrest, but he had downloaded, viewed, then deleted an unknown number of images over a period of at least five years. He received the enhancement for images depicting sadistic or masochistic conduct, and faced a guideline range of 57-71 months. 581 F.3d at 276. In light of the evidence and arguments made at sentencing, the Sixth Circuit upheld as reasonable the sentence of one day in prison, 12 months' home confinement, 10 years' supervised release, and a $5,000 fine, emphasizing that the defendant was in treatment while monitored on supervised release. *Id.* at 277-78, 283. In distinguishing *Stall*, the court in *Robinson* described Stall's sentence as "more severe than Robinson's" because it included a "significant period" of home confinement, and emphasized that the district court in *Stall* "conduct[ed] an extensive analysis of how a [five-year] term of supervised release would restrict [the defendant's] freedom and protect the public and explain[ed] why the district court believed this sentence will deter similar offenders and why this case warranted a variance." *Robinson*, 669 F.3d at 779 (alterations in original, internal quotation marks omitted).

In *Prisel*, the defendant possessed 1,189 images and had paid for videotapes. Under a previous version of the guideline (before the PROTECT Act increases), the applicable guideline range was 27-33 months. 316 F. App'x at 379. Citing a psychological evaluation indicating the defendant presented no danger to children, the defendant's mental and emotional condition, and family responsibilities, the district court imposed a sentence of one day in prison, three years' supervised release, 18 months home confinement, and a $6,000 fine. *Id.* at 380. In affirming the sentence, the Sixth Circuit emphasized the fact that the sentence included 18 months of home detention during the period of supervised release. *Id.* at 385-86. In distinguishing *Prisel*, the court in *Robinson* said that Prisel's sentence was "more severe than Robinson's" because it included a "significant period" of home confinement. *Robinson*, 660 F.3d at 779.

## CONCLUSION

If the criminal justice system has a single unifying theme, it is that we want people to correct their behavior, conform to the rules that society has drawn, and be deterred from repeating committed crimes. Seth would greatly benefit from a sentence we have recommended as he could remain in the community in which he flourishes; he can continue to benefit from the strong relationships he has with friends and family and address any treatment needs he has as described by Dr. Thompson.

For all these reasons, we are recommending that Seth receive a sentence of a six (6) to twelve (12) months of home confinement and a six (6) to eight (8) years of supervised release.

Thank you very much for your time and consideration.

Sincerely,

**Birdsall Law Offices, S.C.**

*/s/John A. Birdsall*
John A. Birdsall
Attorney for the Defendant
State Bar. No. 1017786

JAB/as
Attachments

Cc:  Seth Rector, Defendant
     Assistant United States Attorney William Roach